# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 17-0225V
**Filed: June 6, 2018**
TO BE PUBLISHED

|  |  |
|---|---|
| NATHALIE COLLADO,<br><br>     Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>     Respondent. | Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Amy A. Senerth*, Muller Brazil, LLP, Dresher, PA, for petitioner.
*Ryan Daniel Pyles*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On February 16, 2017, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that she suffered left shoulder injuries caused in fact by the influenza vaccination she received on October 22, 2015. Petition at 1, ¶¶ 2, 13 (ECF No. 1). The case was assigned to the Special Processing Unit of the Office of Special Masters.

On July 20, 2017, the undersigned issued a ruling on entitlement, finding petitioner entitled to compensation for her shoulder injury related to vaccine administration ("SIRVA"). (ECF No. 18). Being previously informed that the parties had been unable to agree upon an appropriate amount of compensation in this case, the undersigned ordered the parties to file simultaneous briefs regarding the damages to be

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, the undersigned intends to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

awarded. For the reasons described below, the undersigned finds that petitioner is entitled to an award of damages in the amount of **$120,772.53, representing $772.53 for actual unreimbursable expenses and $120,000.00 for actual pain and suffering.**

## I.     Relevant Procedural History

With the petition, petitioner filed the medical records needed to establish the merits of her case. *See* Exhibits 1-5 (ECF No. 1); Exhibit List (ECF No. 2); Statement of Completion (ECF No. 6). Respondent filed his Rule 4(c) Report on July 17, 2017, conceding that petitioner is entitled to compensation. (ECF No. 17). Specifically, respondent "concluded that petitioner's alleged injury is consistent with SIRVA; that a preponderance of evidence establishes that her SIRVA was caused-in-fact by the flu vaccination she received on October 22, 2015; and that no other causes for petitioner's SIRVA were identified." *Id.* at 2. Petitioner was ordered to file updated medical records which established her current condition and the parties were instructed to engage in informal damages negotiations. (ECF No. 19).

Over the next four months, petitioner forwarded a demand to respondent and filed a statement and updated medical records regarding her current condition. *See* Status Report, filed Sept. 5, 2017 (indicating petitioner's demand was sent on July 25, 2017) (ECF No. 20); Exhibit 6 (updated medical records) (ECF No. 24); Exhibit 7 (petitioner's statement) (ECF No. 26). Respondent responded to petitioner's demand on December 7, 2017. *See* Status Report, filed Dec. 8, 2017 (ECF No. 28).

On January 11, 2018, petitioner filed a status report indicating she "believe[d] further negotiations will be futile and respectfully request[ed] a status conference to discuss further proceedings." (ECF No. 30). During informal discussions with the staff attorney managing this SPU case regarding their availability for a telephonic status conference, the parties decided they preferred to submit briefs concerning the amount damages to be awarded. *See* Informal Remark, dated Jan. 12, 2018. On January 19, 2018, the undersigned ordered the parties to file simultaneous briefs. (ECF No. 31). Approximately two weeks later, she also ordered the parties to file a joint status report indicating if they wished to participate in mediation. (ECF No. 33).

In February 2018, petitioner filed additional affidavits from her daughters, ex-sister-in-law, and herself. *See* Exhibits 8-11 (ECF No. 34). The parties filed their briefs on March 8, 2018. (ECF Nos. 36-37). They also indicated that petitioner was willing to engage in mediation, but respondent was not. Joint Status Report, filed Mar. 12, 2018 (ECF No. 38).

In May 2018, the staff attorney emailed the parties, regarding documentation for the $772.53 in unreimbursable expenses sought. *See* Informal Remark, dated May 11, 2018. Petitioner filed these receipts the same day. *See* Exhibits 12-13, filed May 11, 2018 (ECF No. 39). A week later, the undersigned ordered petitioner to file the medical records from her March 23, 2018 surgery which she noticed were still outstanding. (ECF No. 40). Petitioner filed these medical records the same day. *See* Exhibit 14, filed May 18, 2018 (ECF No. 41).

## II.   Relevant Medical History

There is no evidence in the medical records filed to show that petitioner suffered left arm/shoulder pain prior to receiving the flu vaccine on October 22, 2015. *See* Exhibit 1 (record of vaccination); Exhibits 2 at 22-44, 49-148; 6 at 1-11, 17-24 (for evidence regarding prior condition).[3]

Two weeks after vaccination, on November 5, 2015, petitioner visited the ER at the Staten Island University Hospital, complaining of left arm pain existing since vaccination and worsening in the last day. Exhibit 2 at 8. Petitioner described her pain as dull and aching. *Id.* at 10. Upon examination, she was noted to have "tenderness over deltoid to muscle" and pain when raising her arm. *Id.* at 12. X-rays were taken, and petitioner was prescribed Motrin and referred to orthopedics, specifically Dr. Reilly. *Id.* at 10-13; *see id.* at 21 (for results of x-rays).

Petitioner was seen at Dr. Reilly's practice by RPA (physician's assistant) Ekonomakos on November 13, 2015. At that visit, petitioner described her pain as "severe pain along the shoulder region." Exhibit 3 at 10. She characterized pain as increasing in severity, rating the level as 10 out of 10. She indicated it occurred during rest, activity and at night and restricted her ability to move. *Id.* at 10-11. Anti-inflammatory medicine and physical therapy ("PT") were prescribed, and an MRI was scheduled. *Id.* at 10. Petitioner may have attended one PT session at Dr. Reilly's practice, Healthcare Associates in Medicine (*see* exhibit 13 at 11, co-pay for "physical therapy" dated 11/23/15), but the undersigned was unable to locate a medical record from that visit.

The MRI was performed on November 25, 2015, and petitioner was seen again at Dr. Reilly's practice on November 27, 2015, this time by Dr. Tejani. Exhibit 3 at 9 (record of November 27, 2015 visit); 14-15 (for results of MRI). Dr. Tejani noted that petitioner's MRI was "significant for partial bursal surface tear of the infraspinatus and of the supraspinatus." *Id.* at 9. He administered a steroid injection and instructed petitioner to continue physical therapy. *Id.*

Petitioner was seen at her PCP for her left shoulder pain on December 4, 2015. Exhibit 2 at 44. She again described her pain as 10 out of 10 and indicated her range of motion ("ROM") was decreasing. *Id.* She was referred to orthopedics and prescribed PT. *Id.* at 45.

Petitioner attended her first PT session at Masefield and Cavallaro on January 27, 2016. She rated her pain as 2-10 on a scale of 10 and described it as a constant aching pain, with intermittent burning and throbbing and sharp pain with movement. Exhibit 4 at 2. She indicated she was unable to lay on her left side, had been forced to alter the way she dressed, and required assistance from her daughter when cooking and lifting objects. *Id.* Petitioner's pain was noted to be 10 out of 10 with the activities attempted. She was assessed as having "significantly decreased left shoulder ROM

---

[3] It appears that petitioner receives her primary care from Staten Island University Hospital. Unless the visit is to the emergency room ("ER"), this hospital will be referred to hereafter as petitioner's primary care provider ("PCP").

3

and strength, poor postural awareness, [and] poor functional mobility." *Id.* at 3. Petitioner received moist heat and ice and ultrasound therapies. *Id.* It was recommended that she attend PT two to three times a week for six weeks. *Id.* at 4.

The next day, petitioner again saw Dr. Tejani. Describing her pain as 8 out of 10, petitioner indicated she "ha[d] been going to physical therapy, which ha[d] been of minimal benefit." Exhibit 3 at 8. She added that her pain was increasing, that it kept her awake at night, and that she was experiencing decreased strength. She described her injury as "greatly affecting her life," rating the negative effect as 9 out of 10. *Id.* Dr. Tejani discussed treatment options with petitioner and scheduled her for "left shoulder arthroscopy, rotator cuff repair, subacromial decompression, and possible biceps tenodesis." *Id.* at 9.

Petitioner returned to Masefield and Cavallaro for PT on February 12, 2016. She informed the physical therapist that she was having rotator cuff repair surgery at the end of March. Exhibit 4 at 8. At that visit, it was reported that she had "pain with end range motion in all planes." *Id.* On March 9, petitioner indicated by phone that in light of her upcoming surgery, her "MD recommended she stop PT." *Id.* at 10. She was discharged from PT with a functional disability rating of 71%. *Id.*

On March 11, 2016, petitioner was seen at her PCP for pre-operation clearance. Exhibit 2 at 46-48. Surgery consisting of rotator cuff repair, subacromial decompression, open biceps tenodesis,[4] and extensive debridement was performed on March 23, 2016. Exhibit 3 at 8. According to the surgical records, petitioner was administered an interscalene block and general anesthesia. Exhibit 14 at 29. Several portals were made under direct visualization. *Id.* "Evaluation of the glenohumeral joint showed there was evidence of a SLAP[5] tear and biceps tenosynovitis.[6]" *Id.* at 30. The need for tenodesis was confirmed. Debridement of multiple areas was performed and a small U shaped tear in petitioner's rotator cuff was repaired. "With the use of a burr, subacromial decompression and acromioplasty[7] was performed." *Id.* A 4 cm incision was made in order to complete the open biceps tenodesis. The surgery was performed by Dr. Tenjani who noted there were no complications. *Id.* at 29-30

At next appointment on April 1, 2016, Dr. Tejani reported that petitioner was "doing well." Exhibit 3 at 7. He instructed her to begin PT. *Id.*

---

[4] Tenodesis is "the stabilization of a joint by anchoring a tendon to a bone, done either surgically or through use of an orthosis." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 1882 (32th ed. 2012).

[5] The labrum is the thick band of tissue which surrounds the shoulder socket and keeps the shoulder joint stable. "In a labrum SLAP tear, SLAP stands for superior labrum anterior and posterior. This means your labrum is torn at the top in both the front (anterior) and back (posterior) of where it attaches to the biceps tendon." https://www.webmd.com/pain-management/labrum-slap-tear#1 (last visited on May 23, 2018).

[6] Tenosynovitis is the "inflammation of a tendon sheath." DORLAND'S at 1882.

[7] Acromioplasty is the "surgical removal of an anterior spur acromion to relieve mechanical pressure of the rotator cuff during movement of the glenohumeral joint." DORLAND'S at 20.

Petitioner attended PT sessions at Masefield and Cavallaro on April 11, April 18, May 5, and May 16, 2016. Exhibit 4 at 11-16. At her last visit on May 16, 2016, petitioner had improved ROM and rated her pain as 4 out of 10. *Id.* at 16. She indicated she was "having difficulty paying her co pays but ha[d] been performing exercises at home." *Id.*

At what appears to be petitioner's last visit to Dr. Tejani on May 18, 2016, petitioner reported improved ROM and pain that was "about 40% improved." Exhibit 3 at 7. Dr. Tejani prescribed additional PT. *Id.* However, it does not appear that petitioner attended any further formal PT. *See id.* at 17-18 (PT billing records); Exhibit 13 at 1-4.

On October 31, 2016, petitioner was seen by her PCP for follow up pertaining to her dyslipidemia[8] and gastroesophageal reflux disease (GERD). Exhibit 6 at 31-32. She reported "no major complaints" and mentioned her shoulder surgery only to explain why she not yet undergone the neck sonogram previously ordered for her thyromegaly.[9] *Id.* at 31.

Petitioner was seen again for an enlarged thyroid and dizziness on April 28, 2017. *Id.* at 28-29. It was noted that she had undergone a thyroid ultrasound but the results were not yet available. A thyroid profile was ordered, and petitioner was instructed to wear compression stockings to combat her dizziness, thought to be caused by orthostatic hypotension.[10] *Id.* at 29. Petitioner's left shoulder surgery was mentioned only in the history section. *Id.* at 28.

The latest medical record filed is from petitioner's August 17, 2017 visit to her PCP. *Id.* at 25-27. In the record from that visit, petitioner's dizziness is described as "[r]esolved." *Id.* at 26. Her shoulder surgery was again mentioned in the history section, but no shoulder issues were noted. *Id.* at 25. In a later section, it was reported that petitioner had "no joint pain." *Id.*

### III. Affidavits Filed by Petitioner

On March 1, 2017, petitioner filed the basic affidavit required by § 11(c)(1). Exhibit 5 (ECF No. 11-1). In that affidavit, she asserted she suffered a left shoulder injury caused by the influenza vaccination she received on October 22, 2016, suffered the residual effects of her injury for more than six months, and has not received an award or settlement for that injury. *Id.* at ¶¶ 3-5.

---

[8] Dyslipidemia is the abnormality in, or abnormal amounts of lipids and lipoproteins in the blood." DORLAND'S at 578.

[9] Thyromegaly or goiter is "an enlargement of the thyroid gland, causing a swelling in the front part of the neck." DORLAND'S at 796.

[10] Orthostatic hypotension is "a fall in blood pressure associated with dizziness, blurred vision, and sometimes syncope, occurring upon standing or when standing motionless in a fixed position." DORLAND'S at 906.

5

In November 2017, petitioner filed a statement indicating she continued to suffer "ongoing shoulder pain" following her March 2016 surgery. Exhibit 7, filed Nov. 7, 2017 (ECF No. 7-1). She stated that she continues to visit her primary care provider every three to four months for her shoulder pain and is "advised to continue home exercises and aleve." *Id.* Petitioner added that she recently tried to see Dr. Tejani again but her appointment was canceled twice. *Id.*

On February 27, 2018, petitioner filed more detailed affidavits from her daughters, Ashley and Alyssa Ramharracksingh, her ex-sister-in-law, Sharon Englebert, and herself. Exhibits 8-11. (ECF No. 34). In her affidavit, petitioner's oldest daughter, Ashley, indicated she no longer sees her mother's previous strength. Exhibit 8 at ¶ 1 (ECF No. 34-2). She described difficulties experienced by her mother when performing tasks such as driving, chopping vegetables, changing curtains, making beds, and washing dishes. Maintaining that her mother's appearance and attitude had changed, Ashley, stated petitioner was no longer "bursting with energy, eager to go to the movies or . . . yoga classes." *Id.* at ¶ 3. She claimed her mother's injury has impacted their vacations because she is unable to handle her luggage or to swim. *Id.* at ¶ 4.[11]

Petitioner's younger daughter, Alyssa, echoed these allegations in her affidavit, asserting that her mother no longer drives her places or volunteers in her after school art class "because she is weakened from the shoulder." Exhibit 9 at ¶ 1 (ECF No. 34-3). She claimed they "hardly take vacations anymore . . . because [her mother] is scared she will do something to damage her shoulder more." *Id.* at ¶ 2.

Sharon Englebert described difficulties experienced by petitioner when shopping and doing laundry. Exhibit 10 (ECF No. 34-4). Maintaining that petitioner was "[a]lways an independent woman" (*id.* at ¶ 1), Ms. Englebert stated "this shoulder incident has completely changed her mentally and physically" (*id.* at ¶ 2).

In her more detailed affidavit, petitioner indicated she is the single mother of two daughters, a 23 year old college student and a 17 year old high school student who suffers from Wilson disease.[12] Exhibit 11 at ¶ 3 (ECF No. 34-5). Maintaining she has no family and receives no support from her ex-husband, petitioner stated she must rely on her ex-sister-in-law "to help [her] with grocery shopping and cleaning the house." *Id.* at ¶ 5. Petitioner described difficulties driving, walking her dog, and dressing. *Id.* at ¶¶ 6-7, 9, 12. She claimed she "no longer ha[s] strength in [her] left shoulder and certain movements are extremely painful." *Id.* at ¶ 4.

## IV.   The Parties' Arguments

Petitioner seeks damages in the amount of $150,000.00. Petitioner's Brief in Support of Damages ("Pet. Brief") at 5 (ECF No. 37). Respondent proposes petitioner be awarded $75,000.00 for actual pain and suffering. Respondent's Brief on Damages ("Res. Brief") at 1 (ECF No. 36). With regard to $772.53 in past unreimbursable expenses requested by petitioner in her demand, respondent indicates he "has no overt

---

[11] This paragraph is labeled as a second paragraph 2. It is clear this is an error, and the paragraph should be labeled as paragraph 4.

[12] Wilson disease is "a rare, progressive, autosomal recessive disease due to a defect in metabolism of copper." DORLAND'S at 545.

basis to refute this amount, [but] does not have substantiating documentation in his files." *Id.* at 1 n.1.

To support the amount she seeks, petitioner cites to four other vaccine cases in which petitioner was awarded between $120,000.00 and $135,000.00 in damages. Pet. Brief at 4. In all cases, petitioner was found to be entitled to compensation, and the parties agreed upon the amount of damages to be awarded. None of these agreements indicated the category of damages being awarded but it can be surmised that the majority of the compensation awarded was for pain and suffering. As noted by petitioner, all four cases involved petitioners who experienced a rotator cuff tear which required surgical repair. However, petitioner argues that her injury was more severe and surgery more extensive. *Id.* (referencing the results of petitioner's MRI and additional procedures performed during surgery).

Petitioner further argues that her "shoulder injury continues to impact her quality of life and emotional well-being," particularly "her time with her daughters, her difficulty with her day to day living, and her ability to remain independent." *Id.* at 5. She has not, however, specified which portion of the $150,000.00 sought should be awarded for past pain and suffering and which portion for future.

Respondent argues for a lower amount, $75,000.00, for petitioner's pain and suffering. Res. Brief at 1. Emphasizing the lack of treatment after May 2016, respondent argues that "[b]ased on this record, the evidence is that petitioner's shoulder surgery was ultimately successful." *Id.* at 11. Respondent maintains that the affidavits filed by petitioner, her daughters, and her ex-sister-in-law "are inconsistent with a lack of continued care, or reporting when medical care was sought." *Id.* at 11-12.

Respondent cites no other cases to support his argued for amount. Instead, he focuses the majority of his argument on the proposition that special masters should award a continuum of compensation for pain and suffering with only the most egregious cases receiving the full amount allowed under the Vaccine Act, $250,000.00. *Id.* at 3-11; *see* § 15(a)(4) (for statutory cap for actual and projected pain and suffering). Respondent asserts that the legislative history of the Vaccine Act and case law prior to the 2013 decision in *Graves*[13] support this approach. However, respondent adds that he agrees "with *Graves* to the extent it calls for an individual assessment of damages based on the specific facts of a petitioner's case." *Id.* at 5.

V. Discussion

The undersigned finds petitioner has provided documentation of actual unreimbursable expenses sufficient to support an award in the amount sought, $772.53. *See* Exhibit 14. Thus, the only issue remaining is the amount of compensation to be paid for petitioner's pain and suffering.

Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *See I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL

---

[13] *Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (2013).

2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013); *McAllister v. Sec'y of Health & Human Servs.*, No 91-103V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995). Examining those factors in this case, giving due consideration to the circumstances and damages in the cases cited by petitioner and other relevant cases, as well as her knowledge and experience adjudicating similar cases, the undersigned has determined petitioner is entitled to an award in the amount of $120,000.00 for actual pain and suffering.

### A. Facts and Circumstances in this Case

The evidence in this case shows petitioner suffered shoulder pain within 48 hours of receiving the flu vaccine on October 22, 2015. Two weeks after vaccination she visited the emergency room at 7:42 a.m. on November 5, 2015, complaining of pain since vaccination severe enough to restrict her movement. At her November 13, 2015 visit to the orthopedist, petitioner described her pain as 10 on a scale of 1-10.

Petitioner continued to suffer pain at this level of severity during the five months between vaccination and surgery. Petitioner was seen on five occasions, at the ER, her PCP, and the orthopedist, attended either one or two PT sessions, and received one steroid injection. The lack of formal PT may have been due to a concern about the cost of these sessions or because petitioner's pain did not allow her to tolerate any additional sessions. The record is not clear on this point. However, the results of the November 25, 2015 MRI shows injury consistent with petitioner's pain and limited movement. Moreover, petitioner consistently described pain as severe during this time.

Further, the operative record shows significant pathology, requiring extensive debridement, rotator cuff repair, and open biceps tenodesis. Thus, she had several procedures, including an open surgical procedure. Although petitioner's surgery was extensive, the evidence shows that she recovered well, requiring only four PT sessions thereafter. At her last orthopedic visit with Dr. Tejani on May 18, 2016, petitioner was described as 40% improved. Dr. Tejani prescribed additional PT, but it appears petitioner did not pursue this treatment. There is evidence showing petitioner's decision to engage in a home exercise program rather than formal PT was due, at least in part, to the cost of such formal PT. By October 2016, petitioner appeared to be have recovered. From that time through August 2017, petitioner sought treatment for other conditions and did not to mention any issues with her arm/shoulder.

As with most SIRVA cases, petitioner is a mentally competent adult, fully aware of her injury. Thus, an extensive discussion regarding her awareness is not required. Petitioner was fully aware of her injury and symptoms thereof.

Regarding the severity and duration of her injury, the undersigned finds that petitioner suffered severe pain and limited ROM in the five months prior to her surgery. These symptoms significantly impacted her abilities, and were, most likely, the reason she did not pursue additional PT, opting instead for surgery. Following surgery, her level of pain was much less. Additionally, it appears she had recovered by October 2016.

8

### B. Other SIRVA Cases

To date, the undersigned has determined the amount of damages to be awarded in a SIRVA case on four occasions.[14]  The award for pain and suffering in these cases ranges from $60,170.00 to $94,900.99, but none of these petitioners had surgery or symptoms which warranted surgery.

Petitioner cites four cases, handled by petitioner's counsel's law firm, in which the petitioner received between $120,000.00 to $135,000.00 for pain and suffering.  In three of these cases, the petitioner underwent surgery, like petitioner in this case.  In the fourth case, petitioner was contemplating surgery which was recommended.

### C. Amount to be Awarded for Pain and Suffering

Based upon the record as a whole, the undersigned finds the facts and circumstances in this case warrant an award of $120,000.00 for actual pain and suffering.  The undersigned agrees that the surgery petitioner underwent in this case was either similar to or more extensive than the surgeries involved in the four cases cited by petitioner as well as surgeries other petitioners have undergone.  Additionally, petitioner's level of pain prior to surgery was severe.  However, the duration of this severe pain was shorter than that of many petitioners suffering from SIRVAs.  Moreover, after surgery, petitioner's level of pain was much lower.  Furthermore, after her surgery, it appears petitioner recovered quickly, requiring only four formal PT sessions and two appointments with her orthopedist, Dr. Tejani.  As the undersigned indicated in *Marino*, there are multiple reasons why a petitioner may or may not seek medical care.  2018 WL 2224736, at *8.  Here, petitioner not only failed to pursue further treatment for her SIRVA after May 18, 2016, she also failed to mention any continuing symptoms at appointments for other conditions in October 2016, April 2017, and August 2017.

Although petitioner did not designate a portion of the amount sought for pain and suffering as being for projected pain and suffering, she did provide affidavits which describe symptoms which continue to date.  However, the undersigned finds that the symptoms described in the affidavits are not reflected in the contemporaneously created medical records.  *See Cucuras v. Sec'y, Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993) (stressing the weight to be given to contemporaneously created medical records).  Moreover, "petitioners bear the burden of proof with respect to each

---

[14] The decision in three of these cases are available to the public.  *See Marino v. Sec'y of Health & Human Servs.*, No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for actual pain and suffering); *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb.1, 2018) (awarding $85,000.00 for actual pain and suffering and $9,900.99 for projected pain and suffering); *Desrosier v. Sec'y of Health & Human Servs.*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering).  The decision in the fourth case will be posted on the court's website, www.uscfc.uscourts.gov, after the parties have been given an opportunity to request redaction of any information contained in the decision.  *See Knauss v. Sec'y of Health & Human Servs.*, No. 16-1372V (awarding $60,170.00 in pain and suffering and issued May 23, 2018).

element of compensation requested." *Brewer v. Sec'y of Health & Human Servs.,* 1996 WL 147722, at *22 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Thus, petitioner has failed to establish by preponderant evidence that she is entitled to an award for projected pain and suffering.

## VI. Conclusion

**For all of the reasons discussed above, and based on consideration of the record as a whole, the undersigned finds that $120,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering.[15] In addition, the undersigned finds that petitioner is entitled to compensation for $772.53 in actual unreimbursable medical expenses.**

Based on the record as a whole and arguments of the parties, **the undersigned awards petitioner a lump sum payment of $120,772.53 in the form of a check payable to petitioner, Nathalie Collado.** This amount represents compensation for all damages that would be available under § 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[16]

**IT IS SO ORDERED.**

                                              **s/Nora Beth Dorsey**
                                              Nora Beth Dorsey
                                              Chief Special Master

---

[15] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[16] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.